**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

|   |   |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) ) ) ) ) ) ) | Case No. 5:24-MJ-5115-MAS<br><br>**Filed Under Seal** |

**APPLICATION OF THE UNITED STATES**
**FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)**

The United States of America, moving by and through its undersigned counsel, respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require Verizon Communications Inc., a cellular service provider, headquartered in New York NY, to disclose certain records and other information pertaining to the phone numbers: 8593364512 and 6063593993 as described in Part I of Attachment A. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order. In support of this application, the United States asserts:

LEGAL BACKGROUND

1. Verizon Communications Inc. is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15), and a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require Verizon Communications Inc. to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2. This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the United States District Court for the Eastern District of Kentucky, is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

3. A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## THE RELEVANT FACTS

4. The United States is investigating violations of 18 U.S.C. § 1855, willfully setting or causing a fire upon lands owned by the United States; 18 U.S.C. § 1856, failing to extinguish a fire upon lands owned by the United States; 18 U.S.C. §1001 willfully making materially false, fictitious, or fraudulent statements; and 18 U.S.C. §1512, tampering with a witness, victim, or informant.

5. The United States Forest Service (USFS) is currently investigating the Natural Bridge Fire, which occurred on April 17, 2023, sometime after 1825hrs Eastern Standard Time. The identified origin area of the Natural Bridge Fire is located in the Natural Bridge State Resort Park near Slade, in Powell County, Kentucky. On April 18, 2023, the fire spread and burned onto land owned and administered by the USFS on the Daniel Boone National Forest. Additionally,

the area in question lies within the Eastern District of Kentucky. Subsequently, the fire burned approximately 125 acres before being contained, with an estimated suppression cost of $701,545.00. Approximately, forty acres of USFS mixed timber burned as a result of the fire burning onto USFS property.

6.  US Forest Service Law Enforcement Officer Kyle McCammon investigated the fire and prepared an Origin and Cause report pursuant to the NWCG PMS-412 Guide to Wildland Fire Origin and Cause. The origin of the fire is the original ignition point where the Natural Bridge fire started and spread from. Officer McCammon determined the origin was located in the area of the following Global Positioning System (GPS) coordinates: (37Deg 46Mins 25Sec, -83Deg 41Mins 0Sec). The origin area was located on top of a cliff line ridge in between the Natural Bridge Ski Lift and the top of a geologic feature known as, Natural Bridge, and along a designated hiking trail named the "Original Trail."

7.  Based on information identified during the investigation and observations made within the origin area, eight of the nine causal categories of wildland fire were excluded through lack of supporting evidence: lightning, campfires, smoking, debris burning, equipment use, railroads, children, and miscellaneous.

8.  The causal category of Arson/Incendiary was listed as the probable cause of the Natural Bridge Fire. The Guide to Wildland Fire Origin and Cause Determination handbook identifies the cause category of arson/incendiary as wildfires deliberately or maliciously set with the intent to damage or defraud. "NWCG Handbook," PMS 412, NFES 1874, Chapter 6, page 215, (2016). Arson is more specifically defined as the intentional and wrongful burning of someone else's property or one's own property (as to fraudulently collect insurance). (Garner, 2009) "NWCG Handbook", PMS 412, NFES 1874, Chapter 6, page 299, (2016). Incendiary is

more specifically defined as deliberately and unlawfully setting fire to property. (Garner, 2009) "NWCG Handbook", PMS 412, NFES 1874, Chapter 6, page 299, (2016). These terms are often used interchangeably.

9. During the investigation, a witness was identified as Natalie McKinley, who is a federal employee with the U.S. Army Corps of Engineers on official work travel to the Natural Bridge State Resort Park, who was in the area at the time of the fire. During an interview with McKinley, she said she was hiking in the Natural Bridge State Park, near the identified origin area of the fire on April 17, 2023, and recorded her hike with a Strava workout application. McKinley also took photos during her hike, which were determined to be time stamped

10. The Strava application mapped her route of travel with locations and times where the various photos were taken during her hike, which assisted investigators with determining locations and times of her observations and travels. After reviewing the data from the Strava application, which McKinley provided, she began her hike at 1824hrs and concluded in close proximity to the origin area of the fire, on top of Natural Bridge, where she did not observe any fire or smoke. During her hike, she observed a group of four to five younger male adults in their late teens to early twenties at the top of Natural Bridge around 1852hrs and the group appeared out of place, did not have traditional hiking clothes or equipment. According to McKinley, this group of male adults was walking towards the determined origin of the fire.

11. After the completion of her hike, McKinley left the area around 1857hrs and hiked back to the Natural Bridge State Resort Park Lodge. On her way to the lodge, around 1916 to 1923hrs, she observed the same group of young male adults running down the Original Trail past her and appeared out of breath as they were running away from the Natural Bridge geologic feature. Shortly after, she began smelling smoke.

12. McKinley described one member of the group as wearing a bright colored long sleeve hoody possibly orange or pink in color. McKinley described the group as having tennis shoes and not wearing hiking gear as is normal in the area. McKinley further described a member of the group having a large logo with writing on the front of one of the shirts.

13. The group was seen running towards an area that does not have any local residences or neighborhoods and is rather rural. There is a two-lane highway, KY-11, which is the primary road for the area, and is the access route to or from the Natural Bridge State Resort Park. Generally, people who commit crimes, intentionally or unintentionally, normally want to distance themselves from the area, oftentimes by running away on foot. Individuals who may have seen the fire and ran to safety would more than likely have called the authorities. The area on top of Natural Bridge State Park also has consistent cell phone service for both Verizon Communications Inc. and AT&T where individuals would likely have coverage to dial 911 and report a fire.

14. A review of security camera videos recorded on April 17, 2023, supplied by Miguel's Pizza located across the KY-11 highway from Natural Bridge State Park showed a group of five individuals matching the general description supplied by McKinley. The individuals appeared to arrive in vehicles coming from the direction of parking lots for Natural Bridge State Park the day of the fire. Two vehicles were potentially related to the group, a white Chrysler 300 sedan and a silver Toyota Tacoma. The individuals showed up at approximately 1937hrs in frame and left together at approximately 2021hrs. The first individual was a late teens to early twenties thin statured white male adult wearing a bright colored sweatshirt in light blue with black athletic shorts and white sneakers. The second individual was a mildly heavyset white male adult in his late teens to early twenties, with a full beard, glasses, dark black hair and was

wearing tennis shoes, blue jeans, and a grey T-shirt. The third individual was a Black male adult in his late teens to early twenties wearing red sweatpants, sneakers, and a grey sweatshirt with a large Rebok logo on the front. Two other individuals were walking behind the group but walked to an area out of view of the camera outside that at initial review appeared too possibly unrelated. The fourth individual was a white male adult of unknown age wearing a grey sweatshirt, black athletic style shorts and had what appeared to be athletic footwear. The fifth individuals was a white male adult wearing a long sleeve pink salmon colored sweatshirt, grey pants, and sneakers. The group later left together as one group.

15. On February 03, 2024, the owners of Miguels Pizza supplied a credit card transaction file showing all purchases made at Miguels Pizza on April 17, 2023, between the hours of 1906hrs and 2059hrs. A query of the names on the credit card transaction file identified a Nikolas Welker by Kentucky driver's license. The driver's license photo appeared to match the second individual seen entering Miguel's Pizza on April 17, 2023. According to the Kentucky DMV database, the photo on Nikolas Welker's driver's license was taken on April 21, 2023, approximately four days after the video footage was recorded at Miguel's Pizza.

16. On February 08, 2024, McKinley was shown the April 17, 2023, videos from Miguel's Pizza. McKinley immediately noticed the group and took note of their appearance. After review of the footage McKinley said she did not believe the individuals in the video were the group she saw on April 17, 2023. However, while the officer was leaving McKinley's residence, she said that the brightly colored shirts in the video were the correct colors.

17. On February 17, 2024, information was located in Kentucky Courtnet from traffic violations that showed Nikolas Welker was associated with a white Chrysler 300 sedan. The video footage from Miguel's Pizza showed a white Chrysler 300 entering the Miguel's Pizza

parking lot from Northbound KY-11 at approximately 1935hrs, approximately 12 minutes after the suspect group was last estimated to be seen by McKinley in Natural Bridge State Park running down trail.

18. Officers were able to locate Nikolas Welker at a residence located at his residence. During the interview Welker made several statements about being present on the day of the fire at Natural Bridge State Park. Welker also supplied his phone number as 8593364512. Welker stated in the beginning "We made it to the top, we looked over and saw the flames and we were like oh shit, so we just left and went and got something to eat." This statement was later recanted by Welker who changed his story to only seeing smoke and not flames. Welker later changed his story to only making it to the base of the Natural Bridge geologic feature and not to the top as stated initially. Welker supplied several other names of people in the group as "Holden Townsend," "Collin Brummitt," "Trevor Randall" and "Quantaveus Dawson." Welker said they had driven to the area in a white Chrysler 300 and a Toyota Tacoma. Welker said that Dawson had begun to climb the "Fat Man Squeeze" up to the top of Natural Bridge geologic feature when they saw smoke and left the area.

19. During the interview Welker said that the group jogged down the trail and that they always try to jog down the trail after completing hikes. Welker said that they had hiked the Original Trail to get to Natural Bridge geologic feature. The Original Trail was the trail the group was last seen running on by the witness, Natalie McKinley. Welker also said that the group did not eat at Miguel's Pizza after the hike and instead ate at Mi Finca Mexican Restaurant in Stanton Kentucky. Mi Finca had burned down and was not open since January of 2023, approximately three months prior to the start of the Natural Bridge Fire. Welker voluntarily gave the phone number of Holden Townsend. Welker later supplied a photo taken on top of the

Natural Bridge geologic feature that had photo metadata from May 06. 2023, approximately eight days after Natural Bridge State Resort Park had reopened from the fire. Arsonists are known to return to the crime scene after the fact based on information in the PMS-412 Guide to Wildland Fire Origin and Cause.

20.     On February 18, 2024, Townsend was interviewed at his residence. Townsend confirmed his phone number. In the interview Townsend said he was present at Natural Bridge the day of the fire. Townsend's narrative was inconsistent with Nikolas Welker's description of the day. Townsend said the group went to Miguel's Pizza after hiking and that the group did not run from the area after seeing smoke. Townsend said that the group only made it halfway up the Original Trial before seeing smoke and turning around. Townsend also said that the group had taken a brown Chevy Tahoe on the day of the fire. During the interview Townsend's mother, who was present, asked if the fire was the day that Townsend had come home and told her they saw smoke. Townsend said yes to his mother's question. Townsend was asked why the group did not call 911 during the interview. Townsend said he thought someone else had called 911.

21.     Townsend said that the group used their phones to communicate, primarily through Snapchat. Townsend said that Trevor Randall, Reuben Brummitt, Collin Brummitt and Quantaveus Dawson were also present the day of the fire. Randall, Reuben Brummitt and Collin Brummitt all lived together nearby and the Brummitt's were determined to be brothers.

22.     Trevor Randall, Reuben Brummitt, and Collin Brummitt were interviewed separately at their residence approximately one hour after the interview with Townsend. Randall was asked at the beginning of the interview if he knew why the police were talking to him. Randall said that he had talked to his friends and that they had told him that law enforcement was asking questions. Randall proceeded to give a seemingly rehearsed version of the day that

matched Townsend's earlier statements. Randall's version of events started to become inconsistent as follow up questions were asked. In the interview Randall said that they had warned other hikers that "The fire was up there. Don't go up there." Randall then volunteered information about why they had not called 911. This information was volunteered before being asked about Randall at first said he did not have his phone and then immediately said that his phone did not have service. Randall's version of events covered most of the follow up questions asked in the previous interview with Townsend.

23. Randall supplied another name of Conner Creech being present with the group on the day of the fire. Creech was alleged to be friends with Dawson. Creech was alleged to have driven a Toyota pickup truck with Dawson as a passenger on the day of the fire. Randall said that Dawson would likely have Creech's phone number. Randall said he primarily communicated with the group through Snapchat. When asked to point out where he saw smoke on a map Randall pointed to almost the exact origin area of the Natural Bridge Fire along the Original Trail.

24. Reuben Brummitt was interviewed separately, immediately after Randall. Reuben Brummitt said he did not remember being present with the group on the day of the fire. Reuben Brummitt said he was normally working on Mondays and would not have been present if he was. It was later determined that Reuben Brummitt was working for the US Postal Service until 5PM on the day of the fire. Reuben Brummitt supplied his current and old phone number.

25. Collin Brummitt was interviewed immediately after Reuben Brummitt. Collin Brummitt gave a story that closely resembled Randall's story and Townsend's story. During the interview follow up questions were asked, and Collin Brummitt eventually admitted he was not present on the day of the fire. Collin Brummitt said that he was told by Welker over the phone on

Snapchat to be "On the lookout for cops." Collin Brummitt then rephrased his answer and said that Welker told him to not be alerted and that the cops would be coming to talk about a fire that occurred. Collin Brummitt said that he had last communicated with Welker on February 17, 2024, after police had already talked to Welker. Collin Brummitt said that Welker told him details the night before and coached him on what to say.

26. During the interviews with Welker, Townsend, Randall, Reuben Brummitt, and Collin Brummitt none of the individuals supplied credible phone contact information for Creech. Dawson was alleged to not have a working phone in one of the interviews. The individuals all had minimal information about Creech and generally said they were not in contact with him other than through Dawson. Dawson was unable to be contacted at his last known address however an individual who identified himself as Dawson's family member took an officers business card as a point of contact. Dawson was also unable to be contacted at another prior residence that his adoptive parents lived at. A valid working phone number was supplied for Dawson (6063593993) by the adoptive parents who said they were currently paying for the phone bill. Creech was initially unable to be located at his last known residence however Creech's parents supplied a valid phone number and different dorm residence for Creech.

27. On February 24, 2024, Conner Creech was contacted by phone call to his cell phone number Creech later was consensually interviewed in the front seat of an officer's patrol car. Creech was told he was free to go prior to questioning. Creech admitted to being present at Natural Bridge the day of the fire. Creech gave little detail about the fire and initially said he only remembered being at the fire with Dawson. This later changed when follow up questions were asked. In the interview Creech said he was friends with Dawson primarily and had minimal contact with Townsend. Creech's vague version of events was similar to Townsend's story given

on February 18, 2024, including details that Collin Brummitt and Reuben Brummitt were present at the fire. Creech was asked why they didn't call 911. Creech said it wasn't on their minds. Creech followed up and stated, "alright there is smoke, let's just get out of here, we don't want to be associated with this." Creech was asked with what he was associated. Creech referenced that there was smoke and danger. Creech was unable to initially pinpoint the smoke location which was pointed out by the officer. Creech continued and stated "…don't want to be hiking on the trail and be like oh there's a fire right here, on this, what, two-mile trail?" Creech nor others interviewed had been told that the fire started on the Original Trail.

28. At one point in the interview Creech was asked if the group walked, ran, or jogged away after seeing the smoke. Instead of answering Creech rapidly exited the patrol vehicle and began walking away. Creech later stated, "You are asking me stupid ass questions." Creech stopped walking away and continued to consensually engage in conversation with the officer at the back of the truck. Creech confirmed he was friends with Dawson. Creech was asked how to contact Dawson. Creech stated, "I guess you will just have to find him." Creech declined to share his Snapchat Username. Creech was asked how he communicated with the group. Creech said he would show up at the other's houses and would normally visit Dawson every weekend. Creech later stopped cooperating and chose to walk away from the officer. While walking away Creech immediately removed a cell phone from his pocket and stared at the screen as the glow lit up his face. Creech began manipulating the device with two hands on each side consistent with someone typing or sending a text message.

29. During the course of the investigation the phone numbers listed above were identified as Verizon Communications Inc. accounts (8593364512 and 6063593993). Further, Snapchat accounts are created using a person(s) phone number and/or email to register. The

information as described in Part II of Attachment A for the described accounts associated with Verizon Communications Inc. can also be used to identify additional methods of communication used by suspects and witnesses.

## REQUEST FOR ORDER

30. The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the events described above, and to determine the nature and scope of their activities. Accordingly, the United States requests that Verizon Communications Inc. be directed to produce all items described in Part II of Attachment A to the proposed Order.

31. The United States further requests that the Order require Verizon Communications Inc. not to notify any person, including the subscribers or customers of the account(s) listed in Part I of Attachment A, of the existence of the Order for a time period of one year. *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.* In this case, such an order would be appropriate because the attached court order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the attached court order will seriously jeopardize the investigation or unduly delay a trial, including by giving

suspects an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or intimidate potential witnesses.

32. The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

CARLTON S. SHIER IV
UNITED STATES ATTORNEY

Ron L. Walker Jr.
Assistant United States Attorney
260 W. Vine Street Suite 300
Lexington, KY 40507
(859) 685-4889 (office)
Ron.Walker@usdoj.gov